302 P.2d 726

Ross McDONALD, Plaintiff-Appellant,

v.

Dave McDONALD, Defendant-Appellee.

No. 6080.

Supreme Court of New Mexico.

Oct. 18, 1956.

John E. Hall, Albuquerque, for appellant.

Charles H. Fowler, Socorro, for appellee.

MACPHERSON, District Judge.

In the late Fall of 1924, three brothers by the name of McDonald purchased a cattle ranch in Socorro County, New Mexico, which the United States Government subsequently took over and leased to form part of the Alamogordo bombing range.

This suit involves a determination of how compensation paid and to be paid by the Government under Title 43 U.S.C.A. Chapter 8A, § 315 et seq., for the use of the ranch as a bombing range for war and national defense purposes, should be divided between two brothers, Dave McDonald and Ross McDonald, the third brother, Rube McDonald, having theretofore sold his interest in the ranch and facilities to his brother, Ross McDonald.

Hereafter, in most instances, the plaintiff below and appellant here, Ross McDonald, will be referred to as Ross; the defendant below and appellee here, Dave McDonald, will be referred to as Dave; and Rube McDonald, the third brother who sold to plaintiff, will be referred to as Rube.

On November 14, 1924, Ross, then aged 25; Dave, then aged 22; and Rube, then aged 21, entered into the cattle business by purchasing 232 head of cattle and the homestead entry rights to 640 acres of land containing a water well (the only permanent water in a large area). Shortly thereafter, leases were obtained in the name of McDonald Brothers on three sections of state land for grazing purposes. Federal public domain was then unrestricted for grazing, and the brothers made free use of the federal domain adjacent to the ranch. After homestead was perfected, title was taken in the name of Dave and Rube only, but both always recognized Ross' one-third interest therein. For several years the ranch operated successfully, most transactions being conducted in the name of McDonald Brothers, all income and expense being commingled, and each brother taking one-third of the profits. The entire ranch operation depended upon the permanent water available on the fee land, and upon a dirt water tank about four miles south, located on federal domain (the source of water for which is not disclosed in the record).

On June 28, 1934, Congress passed the Taylor Grazing Act, 43 U.S.C.A. §§ 315–315r, which ended the free unrestricted use of federal domain for grazing purposes,

but authorized the Secretary of the Interior to issue grazing permits thereon. The brothers then proceeded under this Act and received a federal permit in the name of McDonald Brothers to graze 444 head of cattle on portions or all of some 44 federal sections. In 1938, this Taylor permit was renewed for a ten-year period. The McDonald ranch, including the fee land, state leases, and federal permit, then comprised some 22,000 acres, including ranch headquarters improvements, fences and corrals.

Apparently at the insistence of Ross, a contract was drawn by a notary public on July 25, 1936, and signed by the three brothers, stipulating that each owned a one-third interest "in all real estate in Socorro County", valuing same at $7,500, and restricting the sale of the "real estate or leases" for two years to anyone except the parties to the agreement. The agreement further provides that any brother may remove his individual cattle from the premises at any time, in which event the remaining brothers will maintain the taxes and leases and pay the other brother $1 per head per annum for all stock so removed (with exception in case of general drought). At the end of two years, the restriction concerning the sale is ended, and any brother can sell to an outsider or move back on the property "and be entitled to one-third of the grazing privileges, and to run one-third of the stock which is handled on said property."

Thereafter, each brother owned and ran his own cattle. Nevertheless, they continued to pool all receipts, to share all expenses, and to conduct ranching operations essentially as before. By and large, as might be expected of brothers, few records were kept, honest dealing prevailed among them, and few disputes arose.

On February 26, 1941, the youngest brother, Rube, sold to his older brother, Ross, the aforesaid plaintiff, for a consideration of $4,000, his "undivided interest which consist— of ⅓ of the said MacDonald's Brother— ranch"; he further agreed to turn over to Ross "all state leases and ⅓ interest in one patented section." A few days later, a formal relinquishment of the state leases from Rube to Ross was filed in the State Land Office, and a warranty deed was executed by Rube and his wife in favor of Ross, and duly recorded, conveying Rube's one-third interest to the fee land and the dirt tank on public domain, all buildings, fences, improvements, and appurtenances. Rube thereupon removed his cattle from the ranch.

Ross and Dave continued to conduct cattle operations on the ranch. Each ran approximately the same number of cattle, and once again pooled all income and shared all expenses, on a fifty-fifty basis (with minor exceptions now immaterial), both largely ignoring the fact that Ross had acquired Rube's interest in the ranch,

except that Dave acknowledged his right to run cattle beyond one-third of the ranch's capacity was at the sufferance of Ross. Things were continuing on this "happy-go-lucky" basis, when the Federal Government came into the picture, and if money be the root of all evil, what transpired between these two brothers since then fully exemplifies the truth of this adage.

About October, 1941, the United States Government notified plaintiff and defendant, as well as their surrounding neighbors, that all territory used by them had been set aside for war purposes, and to move out all livestock at the Fall roundup. In December of the same year all grazing permits were cancelled. The brothers removed their cattle from the ranch on April 16 and 17 of 1942, disposed of the same shortly thereafter when other pasturage was unavailable and, in effect, gave up and abandoned their cattle business of seventeen years duration.

On July 9, 1942, Congress amended the Taylor Grazing Act by passing Statute, 43 U.S.C.A. § 315q, providing for the withdrawal of public domain for war purposes and authorizing the payment to persons holding grazing permits or licenses of such amounts for cancellation of grazing permits as should be determined by the head of the federal department or agency using the land to be "fair and reasonable for the losses suffered by such persons as a result of the use of such lands for war or national defense purposes."

Pursuant to this Act, and following long negotiations, largely conducted and successfully prosecuted by Dave, something over $70,000 has been paid, and $7,635 is being paid yearly, not to extend beyond June 30, 1970. Whether these monies should be divided between Ross and Dave on a 50–50 basis, or on a $\frac{2}{3}$rd and $\frac{1}{3}$rd basis, is the exact problem for determination.

Before we can squarely face this issue, however, further facts demand our attention.

While the lengthy negotiations for a settlement were being conducted with the War Department, both brothers signed a letter to the Army Engineers' office in support of their claim for damages, dated February 28, 1945, which contained the following paragraph:

"We know what our ranch will produce and carry as we have used it for many, many years, and on the basis of past history and experience, the amount of $5300.00 which was offered for the three year term is grossly inadequate. Ross McDonald alone paid $2758.82 pasturage on his cattle from April 27, 1942, to July 1, 1944, which exceeds his share of the rental he would have under the offered $5300.-00 payment."

Apparently, under the informal bookkeeping arrangement between Ross and Dave, each was charged pasturage for use of the ranch properties. According to the letter, Ross' "share" would have been one-half of $5,300 or $2,650, which is less than the $2,758.82 he was charged. Had Ross claimed ⅔rds of the $5,300, same would have exceeded the $2,758.82 he "paid".

Again, for a short period, the Government returned the ranch to the brothers, who rented grazing privileges to other cattlemen, the rental receipts from which the brothers divided equally.

Finally, the Government and the brothers agreed upon a proper measure of damages, and in March of 1947, the first two checks, one for $7,200, the second for $3,585, made payable to both brothers and their wives, arrived. All parties endorsed the checks, and thereupon the first serious trouble over the many years broke out between these brothers—Ross picked up the $7,200 check, handed the $3,585 check to Dave, and stated he was entitled to ⅔rds of the money and his brother only one-third. As subsequent checks came in, the controversy continued, Dave keeping one-half of what monies he was able to get, and Ross keeping two-thirds of what monies he was able to get. Finally, the parties agreed to escrow all future payments in the Otero State Bank at Alamogordo, New Mexico, where a considerable sum has accumulated, and is continuing to accumulate, to be divided upon determination of this law suit.

While the record discloses that the parties executed an agreement in December of 1945, with the War Department, covering the matter of payment of compensation to them, this agreement was not introduced in evidence and the record is silent as to its details. All we know is that it covered damages for the McDonald Brothers' inability to conduct their cattle business between April, 1942, and July 1, 1945. Apparently, pursuant to another similar agreement, again not of record, damages were agreed upon for the period July 1, 1945, to July 1, 1948. From the latter day forward, and continuing for a period not beyond June 30, 1970, we find a document in evidence entitled "Lease and Suspension Agreement", executed June 22, 1950, between the Government, on the one part, and Ross and Dave on the other part, which demands our attention.

By the agreement of June 22, 1950, the grantor (Ross and Dave) "leases" to the Government, for the period from July 1, 1948, to June 30, 1970, at $7,055 a year, for 2 years, thereafter at $7,635, a year, the following: (a) the patented land; (b) the federal land; (c) the state land; and (d) all other interests within the Holloman Air Force Bombing Range Project. No statement of ownership, or division of the lease payments is mentioned in the agreement.

The monies paid under this agreement have been escrowed with the Otero State Bank.

The Court below entered 26 findings of fact and 4 conclusions of law. The findings follow substantially the foregoing recitation of facts, except that the contract of July 25, 1936, and the Lease and Suspension Agreement of June 22, 1950, are not mentioned or commented on. The Court's findings give Dave full credit for securing a favorable settlement with the Government, in the face of hindrance by Ross. The Court likewise found that a Government agent "finally admitted that the Government compensation was based upon the use to which the land was being put, such as carrying capacity" (Finding XVII) and that another witness, a member of the Cattlemen's Committee dealing with the Army, testified. "that all compensation fixed for the Ranchers was based strictly upon carrying capacity and use of said land and not at all upon ownership of the same, as in many instances Ranchers were paid compensation where they owned not one acre of any land." (Finding XXVI.)

The lower Court concluded that Ross owned two-thirds of the fee land involved in the case and that Dave owned a one-third interest therein; that the rentals paid by the United States for lands taken were based upon the use of the land before the taking; that as Ross and Dave had used the premises equally and conducted their cattle business on a fifty-fifty basis they were each entitled to one-half of the money in controversy. Judgment was entered that the money paid and to be paid in the future should be equally divided, from which judgment Ross appeals.

In brief, Ross, as appellant, contends the monies in question are annual rentals for the use of the ranch property, paid pursuant to written lease, and should be divided in proportion to the ownership of the ranch. Dave, on the other hand, in support of the judgment, contends the monies are not in reality rentals, but payments to compensate the parties for their losses by reason of being prevented from carrying on their livestock businesses, which should be divided in proportion to the measure of use being made of the ranch at the time the Federal Government assumed control of it.

We believe the trial court erred in failing to make a finding concerning the Lease and Suspension Agreement of June 22, 1950, a point properly preserved by appellant. In our opinion this agreement is of vital significance in the determination of this case, because Dave has acknowledged his right to run cattle upon the ranch beyond one-third of its carrying capacity was at the sufferance of Ross. Therefore, there is nothing upon which to predicate a legal right in Dave to receive more than a one-third share of the proceeds unless such right exists under the Government agreement and the laws under which the payments are authorized. With this added

finding in the record, we will proceed to determine whether the evidence is sufficient to support the findings that the Federal Government negotiated with Ross and Dave on the basis of the use made of the premises; whether the federal statutes authorize payment upon that basis; and whether, in turn, the findings support the judgment.

■ At the outset we note that Dave pursues a theory in support of the judgment here which differs from that followed below. There his position was that Ross owned a two-thirds interest in the state leases and Taylor Grazing Permit as well as the fee lands and improvements, but because he (Dave) actually used one-half of the entire ranch he was entitled to one-half of the proceeds in question. Here he urges that the trial court did not find that plaintiff owned anything more than a two-thirds interest in the fee lands and improvements; that Rube McDonald's relinquishment of his interest in the state leases to Ross was ineffective; and that Rube McDonald had no conveyable interest in the Taylor Grazing Permit by virtue of provision of the Taylor Grazing Act, § 315b, 43 U.S.C.A., that "the issuance of a permit pursuant to the provisions of this chapter shall not create any right, title, interest, or estate in or to the lands."

Interesting as this contention is, it is foreclosed by the judgment entered below from which appellee Dave has taken no cross appeal. It provides:

"It Is Ordered Adjudged And Decreed:

"(a) That the plaintiff, Ross McDonald, is the owner of an undivided two-thirds interest in and to the McDonald Ranch, described as

"The South half of the NW Quarter, the SW Quarter, and the SE Quarter, of Section 4, and the NE Quarter, and the North half of the NW Quarter, of Section 9, Township 9 South of Range 4 East, N.M.P.M., containing 640 acres, more or less, and the State of New Mexico lease lands and Taylor grazing allotment used in connection with said patented lands and State lease lands, and that the defendant, Dave McDonald, is the owner of an undivided one-third interest in said ranch and properties."

· The federal act under which the monies in question have been paid, Act of July 9, 1942, as amended, appearing at 43 U.S.C.A. § 315q, reads as follows:

"Whenever use for war or national defense purposes of the public domain or other property owned by or under the control of the United States prevents its use for grazing, persons holding grazing permits or licenses and persons whose grazing permits or licenses have been or will be canceled

because of such use shall be paid out of the funds appropriated or allocated for such project such amounts as the head of the department or agency so using the lands shall determine to be fair and reasonable for the losses suffered by such persons as a result of the use of such lands for war or national defense purposes. Such payments shall be deemed payment in full · for such losses. Nothing herein contained shall be construed to create any liability not now existing against the United States."

(The amendment, effective May 28, 1948, merely inserted "or national defense" between "war" and "purposes" wherever appearing.)

The Act was further amended October 29, 1949, by adding a new section now cited as 43 U.S.C.A. § 315r, reading: "In administering the provisions of section 315q of this title, payments of rentals may be made in advance."

It is to be noted that under this Act there are no court proceedings provided for; condemnation in the usual sense of the word is absent; after the federal domain is withdrawn and permits cancelled, the monies to be paid by the Government come through administrative action by the head of the department or·agency involved. Here the monies paid and to be paid were mutually agreed upon, but no division as between Ross and Dave ever stipulated.

■ A reasonable interpretation of these two sections would indicate that the Government, in withdrawing the federal domain, can cancel existing permits, paying for the "losses suffered", Section 315q, or in lieu thereof can pay "rentals", and in effect lease back the Government's own permit, Section 315r. It might appear incongruous for the Government to lease back its own federal domain, but that is exactly what happened in the present case.

The document by which the parties settled their differences with the Government for the period from July 1, 1948 forward, is the Lease and Suspension Agreement of June 22, 1950. As stated, the earlier agreements were not introduced of record, but we can assume they followed the general tenor of the June 22 agreement. (The record does show one other form of agreement, signed between the Government and Ross, but not·by Dave, introduced to show Ross' willingness to accept any offer made —which form is substantially the same as the June 22, 1950 agreement.)

In addition to the features of the June 22, 1950 agreement mentioned above, we would point out that the grantor warrants title to the Taylor grazing permit and the . 640-acre fee land and that "rental" is determined at certain amounts per annum but payable at the *end* of each quarter.

This document does not fall. strictly within either of the pertinent Federal Statutes, 43 U.S.C.A. §§ 315q or 315r. The

federal grazing permit is apparently not cancelled for in the agreement the grantor specifically warrants title to the permit. Again, Section 315q seems to contemplate payment for cancellation of the *federal permit only*, while here the agreement covers not only the federal permit, but the state leases, the fee land, and all other improvements. Likewise, Section 315r authorizes payment of rent in advance, while here the rental is paid at the *end* of each quarter.

The most that we can assume is that in executing this agreement the Government, acting through the Corps of Engineers, proceeded under Sections 315q and 315r in leasing back the federal Taylor grazing permit, and under other statutes not before the Court in leasing the fee land, the state leases and the other improvements.

The findings of the lower Court as to the basis upon which settlement was reached with the Federal Government have been described above, but are here set out in full:

"XVII.

"About the month of December, 1944, a Trespass charge was filed against both Dave and Ross and an Order was served for both to appear and Show Cause in January, 1945, why they should not be punished for contempt. Upon an Answer being filed by Dave denying any guilt, the Government withdrew the charge as to Dave, but Ross admitted the charge and Judge Neblett Dismissed the same, and immediately after that Hearing, Dave, Ross and their respective attorneys, went to the office of the United States Attorney Robinson, where discussion followed and Government Agent Schadel finally admitted that the Government compensation was based upon the use to which the land was being put, such as carrying capacity, and offered to increase the $5300.00 prior offer by $200.00, but Dave again refused to sign."

"XXVI.

"Dick Gilliland, a witness, testified that—without being disputed—he was on the Committee that represented the Cattlemen to deal with the Army, and was elected in March, 1949, at the Cattlemen's Convention, and was also on the Advisory Board, and that all compensation fixed for the Ranchers was based strictly upon carrying capacity and use of said land and not at all upon ownership of the same, as in many instances Ranchers were paid compensation where they owned not one acre of any land."

The first of these findings is based upon the following testimony of Ross, so far as we can determine:

"Q. Do you recall that you **moved** your cattle back on the property down

there, in violation of the government's order upon you in '44? A. Yes.

"Q. And the government filed a criminal trespass charge against you, didn't they? A. Yes, sir.

"Q. And Dave too? A. Yes, sir.

\*   \*   \*   \*   \*   \*

"Q. While this was going on, and while you were on that trespass up there, did you, or did you not, have Mr. Hall with you, and Mr. Newell was with Dave; he was his attorney, wasn't he, you all four went into Shadel's office, didn't you? A. Yes, sir.

\*   \*   \*   \*   \*   \*

"Q. Isn't it a fact that Mr. Newell did insist to Mr. Shadel that the true criterion and the rule of the thumb to be used by the government is to pay you ranchers for the use that you were making of the land? A. Yes, that's right.

"Q. Isn't it a fact, right there, that Shadel refused to show and reveal to Mr. Newell that amount and number of cattle that this ranch was supposed to have as carrying capacity? A. I don't know about that part.

"Q. Isn't it a fact that eventually, however, after a question by Mr. Newell, he was going to show it anyway, he brought forth a slip of paper stating that this cattle ranch was shown as 370 cows in pasturage? A. He had to go to the grazing office in Albuquerque to get it.

\*   \*   \*   \*   \*   \*

"Q. Don't you remember, also at that conference that Mr. Newell complained that they hadn't used the full 440 figure, that you finally had it raised to by your appeal under the Taylor Grazing Act, you don't remember that either? A. Yes, I remember that.

"Q. Yes, of course you remember that, it was based at that time entirely on carrying capacity, wasn't it? A. It has been all the time."

■ While finding No. XVII is correct as it stands, the testimony upon which it is based does not support the inference that nothing except the annual carrying capacity set by the Taylor grazing permit was used in arriving at extent of usage—indeed, that it was used as a "rule of thumb."

As to finding No. XXVI, Gilliland, defendant Dave's witness, testified he was a member of a committee elected in the Cattle Growers' Association to work with the army to try to reach an agreement with the Federal Government on a price the Government would offer, attempting to get the offer up to present day values. He then testified:

"Q. * * * did you have any discussions with these representatives as to the basis upon which the compensation should be made to them, did you talk about carrying capacity? A. We did. Yes, sir, and we said it was to be settled on carrying capacity.

* * * * * *

"Q. Now, when the government finally entered into these leases, for you ranchers on the bombing range, they settled on the basis of permits that had been established by the Division of Grazing years before, didn't they? A. Yes, sir, that was many years before, a few years before, not too many.

"Q. They didn't pay any attention to the number of cattle that happened to be on the range at that particular time did they? A. No, sir.

"Q. The settlement was on the basis of permits that had been established by the Division of Grazing, is that right? A. Yes, sir. * * *"

This testimony supports the finding thereon, but again cannot be the basis of inference that the negotiations were concerned with actual use. There is no indication the Government knew or cared who owned the cattle which happened to be on the range at the time. Instead, the permit holders were compensated for the loss of the right of grazing privileges solely upon the basis of the number of cattle specified in their permits as the annual carrying capacity.

We see nothing in the negotiations for settlement, the Lease and Suspension Agreement, or the statutory authority under which the funds were and are being paid to indicate the Government officials were authorized to or did arrive at a compensation base separating ownership from use.

We believe the court below was impressed by Dave's efforts in procuring a favorable settlement with the Federal Government in the face of not only indifference, but even hindrance, by Ross. But Dave has admitted there was never any agreement for payment for his services or reimbursement for his expenses.

The findings, in the light of the testimony upon which they are based, the settlement made, and the authority therefor, do not support the conclusion and judgment that Dave is entitled to share equally in the monies in controversy.

■ Finally, appellant Ross has claimed error in the refusal of the lower court to order an accounting, part of the relief sought in original suit. Of necessity, the same will be required to settle this controversy, and we so hold.

The judgment, except for that portion adjudging the plaintiff to be the owner of an undivided two-thirds' interest in the fee lands, improvements, state leases and Tay-

470

lor grazing permit, and the defendant to be the owner of an undivided one-third interest therein, is reversed and the cause remanded for the entry of a new judgment and further proceedings consistent with this opinion.

It is so ordered.

COMPTON, C. J., and LUJAN, SADLER and McGHEE, JJ., concur.